In the Matter of the ADOPTION OF L.C., A Minor Child.

No. 49A02–9409–CV–00548.

Court of Appeals of Indiana, Fifth District.

May 19, 1995.

Rehearing Denied July 12, 1995.

Lawrence T. Newman, Indianapolis, pro se.

Beverly R. Newman, Indianapolis, pro se.

J. Joseph Curran, Jr., Atty. Gen., Wendy J. Greenberg, Asst. Atty. Gen., Baltimore, MD, Michael P. Bishop, Bishop Smith & Bishop, Indianapolis, for appellee.

SHARPNACK, Chief Judge.

## OPINION

Lawrence and Beverly Newman appeal the trial court's decision dismissing their petition for adoption of L.C. We affirm.

The Newmans raise eight issues for our review, which we consolidate and restate as:

1. whether the trial court erred in permitting the Worcester County Department of Social Services ("WCDSS") to withhold consent to adoption;[1]

2. whether the trial court erred in determining that the adoption was not in L.C.'s best interests when a welfare report had not been filed with the trial court;

3. whether the trial court erred in determining that the adoption was not in L.C.'s best interests after determining that consent was not being unreasonably withheld by the WCDSS;

4. whether the trial court erred in quashing the Newmans' subpoena of L.C. to testify at the adoption hearing;

5. whether the trial court erred by not appointing a guardian ad litem to represent L.C. at the adoption hearing;

6. whether the trial court erred in qualifying witnesses of the WCDSS as experts; and

7. whether the trial court erred in refusing to disqualify Judge Charles J. Deiter.

### Facts

After many years of trying to adopt children, the Newmans were informed in February, 1993, that three children in Maryland were available for adoption. The three children were wards of the State of Maryland and were under the guardianship of the WCDSS. Their biological mother had been

---

1. We consolidate within our first issue the Newmans' first and eighth issues, which challenge the sufficiency of the evidence supporting the court's judgment.

murdered and their biological father, who was incarcerated, had had his parental rights terminated. Two of the children, R.C. and M.C., were fraternal twin boys aged seven-and-one-half years at the time. The other child was a girl, L.C., aged three-and-one-half years at the time.

On March 1, 1993, the Newmans were interviewed at the WCDSS by Ann Turner, a caseworker. Turner informed the Newmans that the boys had been sexually abused when they were two-and-one-half years old, had learning disabilities, and required medication, and that it was the goal of the WCDSS to keep the siblings together and to have any adoptive family maintain contact with the children's maternal grandmother. On March 23, 1993, the WCDSS entered into an Interstate Compact Placement Agreement with the Family Protection and Development Bureau of the Indiana State Division of Family and Children, providing that the Children's Bureau of Indianapolis, Inc., the agency chosen by the Newmans, would supervise the placement in Indiana. Patricia Reidl was assigned as the caseworker.

On March 29, 1993, the three children were placed in the Newmans' home. Over the next several weeks, problems with the children surfaced and it became apparent to the Newmans that the children's physical and developmental problems were worse than they had anticipated. All three children were severely undereducated; L.C. threw tantrums and displayed anti-social behavior; R.C.'s teeth were in poor condition and he could not speak intelligibly; M.C., who still needed to wear diapers at night, drenched his bed almost every night. Both boys displayed various inappropriate sexual acting-out behaviors, including the "mounting" of L.C. and other girls.

On September 19, 1993, the Newmans sent a letter to Turner requesting that M.C. be removed from their home because they felt that he posed a threat to his siblings. On September 24, 1993, M.C. was returned to Maryland by the WCDSS.

On December 3, 1993, the Newmans wrote to Reidl requesting that another placement be found for R.C. because of further problems with violent behavior and sexual acting-out. On December 6, 1993, the Newmans wrote again to Reidl requesting that R.C. be removed from their home immediately. On December 13, 1993, Reidl picked R.C. up from the Newmans' home and brought him to the Family Support Center, a shelter. On Friday, December 18, 1993, Reidl put R.C. on a flight to Maryland, where he was placed in a foster home.

On December 15, 1993, the Newmans wrote to Turner to inform her that they wanted to adopt L.C. immediately. Concerned about the Newmans' parenting skills and methods of discipline, Turner met with L.C.'s court-appointed attorney and officials of the WCDSS to discuss L.C.'s placement with the Newmans. It was agreed that a psycho-social evaluation of L.C. and the Newmans was necessary to determine if the adoption should proceed.

On January 13, 1994, WCDSS faxed a letter to Reidl setting forth the requirements of the WCDSS to consent to the adoption. Reidl then met with the Newmans on that date to discuss the required evaluations. A copy of the WCDSS's letter to Reidl was received by the Newmans four or five days later. A series of conditions placed upon the evaluations by the Newmans prevented the evaluations from taking place, however. On January 24, 1994, the Newmans faxed a letter to Reidl requesting a copy of the original assessment stipulations from Maryland before going forward with the evaluations. A week later, the Newmans asked that they or a babysitter be permitted to sit in on L.C.'s evaluation, contending that L.C. could not be comfortable otherwise. The testing service did not agree, and the Newmans then requested that L.C. be evaluated by a black female psychologist, because L.C. felt comfortable in the presence of black women. Agreement on a black female psychologist was not reached, however, and ultimately a hispanic female psychologist was found acceptable by the Newmans. Further objections to the evaluations were made, however, in letters to the WCDSS and the Children's Bureau of Indianapolis dated March 7, 1994, concerning the Newmans' access to the test results and alleging that the agencies had

failed to investigate reports of child abuse and neglect made by the Newmans.

In March, 1994, the WCDSS obtained an order from the Circuit Court for Worcester County, Maryland, authorizing L.C.'s removal from the Newman home. On April 13, 1994, the Newmans filed a petition to adopt L.C. in the Marion County Superior Court, Probate Division. On April 22, 1994, the WCDSS filed its motion to contest adoption, and the matter was set for a hearing.

On May 12, 1994, the WCDSS obtained an order from the Marion County Superior Court giving the Maryland order full faith and credit and requiring the Newmans to transfer custody of L.C. to the WCDSS.[2] On May 19, 1994, the Newmans filed a verified request for change of judge, alleging that Judge Charles J. Deiter was biased and prejudiced against the Newmans. Judge Deiter denied the motion.

L.C. was removed from the Newman home in the early morning hours of May 28, 1994. On June 2 through 4, 1994, a hearing on the Newmans' petition to adopt was held. On June 7, 1994, the trial court issued its order dismissing the Newmans' petition and finding, inter alia, that the WCDSS had filed timely written reasons for withholding consent to adoption, that WCDSS is the court-appointed guardian of L.C. and has been empowered by the appointing court to consent to the adoption, that the WCDSS has not consented to the adoption, that the WCDSS was not unreasonably withholding its consent, that the adoption would not be in the best interests of L.C., and that dismissing the petition for adoption would be in the best interests of L.C.

■■■ The trial court entered its findings sua sponte. In such a case, the general judgment will control as to the issues upon which the court has not made findings and the specific findings control only as to the issues they cover. *Blazek v. Blazek* (1994), Ind.App., 631 N.E.2d 518, 520. We may affirm a general judgment on any theory supported by the evidence adduced at trial.

*In re Marriage of Snemis* (1991), Ind.App., 575 N.E.2d 650, 652. We may not reverse the trial court's findings in such circumstances unless they are clearly erroneous. Ind. Trial Rule 52(A). Findings of fact are clearly erroneous when the record lacks any evidence or reasonable inferences from the evidence to support them. *In re Marriage of Tearman* (1993), Ind.App., 617 N.E.2d 974, 976. To determine whether the findings or judgment are clearly erroneous, we consider only the evidence favorable to the judgment and all reasonable inferences flowing therefrom, and we will not reweigh the evidence or assess witness credibility. *Id.*

## I

The Newmans argue first that the trial court erred in permitting the WCDSS to withhold consent to the adoption. Specifically, the Newmans contend that the consent of the WCDSS was unnecessary for the adoption to proceed because the WCDSS failed to respond in writing to the Newmans' request for consent within sixty days, as required by I.C. § 31-3-1-6(i)(6). In the alternative, the Newmans argue that the WCDSS unreasonably withheld its consent.

Under I.C. § 31-3-1-6(a), the prospective adoptive parents must establish the written consent of all applicable parties listed in the statute. In this case, the applicable subsection is the following:

"(a) Except as otherwise provided in this section, a petition to adopt a child under eighteen (18) years of age may be granted only if written consent to adoption has been executed by:

\* \* \* \* \* \*

(3) Any person, agency, or county department of public welfare having lawful custody of the child whose adoption is being sought."

I.C. § 31-3-1-6(a)(3). As the WCDSS had lawful custody of L.C., it was incumbent upon the Newmans to obtain the WCDSS's consent to the adoption.[3] This the Newmans

---

**2.** The Newmans have filed a separate appeal of the order of the Marion County Superior Court granting full faith and credit to the Maryland order.

**3.** We note that the Placement Agreement signed

failed to do, seeking instead to adopt L.C. without the consent of the WCDSS.

Under I.C. § 31–3–1–6(i), consent to an adoption is not required from a

> "legal guardian or lawful custodian of the person to be adopted who has failed to respond in writing to a request for consent for a period of sixty (60) days or who, after examination of the written reasons for withholding consent, is found by the court not to be in the best interests of the child."

I.C. § 31–3–1–6(i)(6). The first part of this subsection unambiguously provides that in order to adopt a child without consent, the petitioner must show that the legal guardian or lawful custodian failed to respond within sixty days to a request for consent. The second part is ambiguous in that it appears to require the petitioner to show that the legal guardian or lawful custodian itself is not in the best interests of the child. We find it logical to interpret this subsection as requiring the petitioner to show that the legal guardian or lawful custodian is not *acting* in the best interests of the child in withholding consent, based upon an examination of the written reasons for withholding consent.[4]

As to the first part of this test, the record shows that the Newmans wrote to Reidl on December 7, 1993, stating that they were "fully prepared to adopt [L.C.] immediately" and to the WCDSS on December 15, 1993, stating that they wanted "to adopt [L.C.] immediately" and wished "to begin adoption proceedings immediately." Record, pp. 1231, 835. On January 13, 1994, the WCDSS faxed a letter to Reidl stating that it would require a complete psycho-social assessment before it would give its consent to the adoption. Reidl met with the Newmans on that date and discussed the letter with them.

The Newmans received a copy of the letter four or five days later.

■ The WCDSS argues that even if the statements in the Newmans' letters could be regarded as requests for consent, which it disputes, the Newmans' receipt of its letter satisfied the requirement. We agree. Indeed, the WCDSS's letter to Reidl treats the Newmans' letters as if they were requests for consent, setting forth clearly what the WCDSS will require before "giving it's [sic] consent for the adoption of [L.C.] by the Newmans." Record, p. 1291. We find that the receipt of this letter by the Newmans is sufficient to satisfy the statutory requirement.

■ As to the second part of the test, the Newmans had the burden of showing that the WCDSS was not acting in L.C.'s best interests in withholding consent, based upon its reasons for withholding consent to the adoption. This is a heavy burden in light of the implicit presumption in I.C. § 31–3–1–6(i)(6) that the legal guardian is acting in the child's best interests, and it is a burden the Newmans have not met.

■ The WCDSS filed its written reasons for withholding consent to adoption with the trial court on June 1, 1994, and supported those reasons with evidence at trial. The WCDSS established that the Newmans were unable adequately to deal with the physical and mental afflictions suffered by L.C.'s brothers after having agreed to adopt the three siblings as a group, forcing the WCDSS to remove the boys at short notice. The Newmans ignored the WCDSS's request that they continue to give the boys medication that had been prescribed for them by a Maryland psychiatrist. The Newmans em-

---

by the Newmans provided, in pertinent part, that the Newmans would not "begin court proceedings for the adoption without the approval of the Department of Social Services" and that "the Department of Social Services has the right to remove the child at any time prior to adoption should the Department of Social Services consider it to be in the child's best interest." Record, p. 185.

4. The wording of the predecessor to this subsection was also problematic; it was termed "awkward and confusing" by Judge Garrard of this

court. *In re Adoption of M.J.C.* (1992), Ind.App., 590 N.E.2d 1095, 1100. The previous version provided that consent was not required of any legal guardian or lawful custodian "who, after examination of his written reasons for withholding consent, is found by the court to be unreasonably withholding his consent." I.C. § 31–3–1–6(g)(6) (Burns 1987).

We also note that contrary to the Newmans' assertion, the present version of this subsection took effect on March 18, 1994, pursuant to P.L. 1–1994, Sec. 143.

ployed questionable disciplinary techniques in that R.C. was denied breakfast as punishment for wetting his bed. The Newmans were uncooperative in the WCDSS's efforts to arrange for a psychological evaluation for them and L.C. prior to consenting to the adoption. The Newmans' use of publicity in their effort to adopt L.C. negatively affected all three children.

As noted above, we may not reverse the trial court's findings unless they are clearly erroneous, looking only at the evidence most favorable to the judgment. The trial court's finding that the WCDSS did not unreasonably withhold its consent is supported by the evidence and not clearly erroneous.

The trial court did not err in permitting the WCDSS to withhold consent to the adoption.

## II

The Newmans next argue that the trial court erred in determining that the adoption was not in L.C.'s best interests when a welfare report had not been filed with the trial court. Specifically, the Newmans argue that a welfare report is a statutory prerequisite to a determination of an adoption petition.

■ The Newmans are correct in that no welfare report appears to have been filed with the court. Under I.C. § 31–3–1–4, a welfare report must be filed with the trial court in all adoption proceedings. I.C. § 31–3–1–4(d). However, where the proceedings are contested, the report may not be considered by the trial court. *Matter of Adoption of Thomas* (1982), Ind.App., 431 N.E.2d 506, 510 n. 5. The reason for this rule was stated by the Indiana Supreme Court as follows:

> "To interpret this statute as allowing said report ... to be used as evidence in a contested case, under the guise of being an official report authorized by state to be used as evidence, would result in an unfair trial. The report contemplated by this statute might well include 'gossip, bias, prejudice, trends of hostile neighborhood feelings, the hopes and fears of social workers,' as well as hearsay and opinion."

*Attkisson v. Usrey* (1946), 224 Ind. 155, 160, 65 N.E.2d 489, 491 (quoting *People v. Lewis* (1932), 260 N.Y. 171, 183 N.E. 353, 355).

Thus, even had the report been filed, the trial court could not have considered it in making its determination on the Newmans' petition to adopt. "[W]hen a trial court's error does not substantially prejudice a party[,] reversal is not warranted." *In re Marriage of Sloss* (1988), Ind.App., 526 N.E.2d 1036, 1041. Any error in the failure to file the welfare report must be regarded, therefore, as harmless.

## III

The Newmans argue that the trial court erred in determining that the adoption was not in L.C.'s best interests after determining that consent was not being unreasonably withheld by the WCDSS. Specifically, the Newmans contend that a court may not apply the "best interests" test until one of the statutory grounds for dispensing with consent has been proved. We disagree.

Under I.C. § 31–3–1–6(i)(6), even where the sixty-day deadline for a response has been met and consent has been refused, a court may grant a petition to adopt without the consent of the legal guardian if the legal guardian is found by the court not to be acting "in the best interests of the child," as discussed above. The "best interests" test is implicated, therefore, in a determination of whether the guardian's consent is required.

■ In addition, under I.C. § 31–3–1–6.3, the court must dismiss a petition to adopt if the person who files the petition to contest the adoption has established that "it is in the best interest of the child that the petition to contest the adoption be granted." I.C. § 31–3–1–6.3(c)(1)(A). Thus, even if consent has been given or waived, where a person filing a petition to contest the adoption can show that the adoption is not in the child's best interests, the petition to adopt will be dismissed. Clearly, the court's finding that the WCDSS's consent was not unreasonably withheld does not preclude finding that the adoption was not in L.C.'s best interests.

## IV

The Newmans argue next that the trial court erred in quashing the Newmans' subpoena of L.C. to testify at the adoption hearing. Specifically, the Newmans contend that the trial court denied them the right to examine L.C. under oath and present her testimony as to her wishes.

In *Newton v. Yates* (1976), 170 Ind. App. 486, 353 N.E.2d 485, this court dealt with the question of the court's authority to quash a subpoena for attendance at a hearing for the first, and apparently the last, time. The court stated:

"Having found no definitive authority for the quashing of a subpoena *ad testificandum* and being provided with none by counsel for any of the parties, this issue must be treated as one of first impression in this state.

Farm Bureau argues that T.R. 45(B) provides authority for a trial court to quash a witness subpoena. That rule however, deals with subpoena *duces tecum* and has no applicability to subpoenas *ad testificandum.*

The reasons for the granting [of] a motion to quash the subpoenas appears [sic] to be immateriality, irrelevancy, and inadmissibility. These, in essence, were the only grounds placed before the trial court by Farm Bureau.

Here ... both [witnesses] probably possess some relevant and admissible evidence to offer at trial....

The procedure for separating admissible from inadmissible testimony must not be the quashing of *all* testimony.

For the above reason, we find it necessary to reverse for the quashing of the subpoena *ad testificandum.* We are further reinforced in our decision by the fact that these same witnesses were protected from deposition by the trial court. In effect, any knowledge of the physical evidence which they may possess has been barred from Newton."

*Id.* at 493–94. Thus, we may glean from the court's opinion in *Newton* that the quashing of a subpoena *ad testificandum* is improper where a witness potentially possesses some relevant and admissible evidence to offer at trial.

In the present case, the threshold issue at trial was whether the WCDSS was acting in L.C.'s best interests in withholding consent, based upon its reasons for withholding consent to the adoption. Upon an examination of the record, we conclude that the testimony of L.C. would have been irrelevant to a determination of this issue. All of the reasons for withholding consent set forth by the WCDSS related to the Newmans' failure to cooperate with the WCDSS or to the Newmans' failure adequately to care for L.C.'s siblings. The testimony of L.C. as to her wish to be adopted by the Newmans would have been irrelevant to the court's determination of whether the WCDSS's reasons for withholding consent showed it to be acting in her best interests. The court did not err in quashing the subpoena.

## V

The Newmans argue next that the trial court erred in failing sua sponte to appoint a guardian ad litem to represent L.C. at the adoption hearing. Specifically, the Newmans contend that the trial court was required to appoint independent legal representation to protect L.C.'s interests.

Under I.C. § 29-3-2-3(a), the court must appoint a guardian ad litem to represent the interests of a minor "if the court determines that the ... minor is not represented or is not adequately represented by counsel." Indiana T.R. 17(C) provides, similarly, that "[i]f an infant ... is not represented, or is not adequately represented, the court shall appoint a guardian ad litem for him...." T.R. 17(C). Under these rules, a trial judge need only appoint a guardian ad litem if he believes the minor is not otherwise adequately represented. *Crayne v. M.K.R.L.* (1980), Ind.App., 413 N.E.2d 311, 313.

In the present case, while the interests of L.C. were certainly affected by the outcome of the trial, the appointment of a guardian ad litem for L.C. could have had no bearing on the court's determination of whether the WCDSS had improperly withheld consent to the adoption. Thus, there was no apparent

necessity for such an appointment. No evidence was presented, moreover, to indicate that the WCDSS and the Newmans were acting adversely to L.C.'s interests. In addition, we note that the court heard testimony from L.C.'s Maryland court-appointed attorney, who, although not representing L.C. in this proceeding, testified that her role was

"to represent to the Court [sic] and any tribunal where [L.C.]'s interest is at stake, what I perceived to be in her best interest, based upon my own independent investigation of facts and my own professional responsibility to the client."

Record, p. 399.

The court did not abuse its discretion by not appointing a guardian *ad litem* for L.C.

## VI

The Newmans argue next that the trial court erred by qualifying three witnesses of the WCDSS as experts and permitting them to give expert opinion testimony. The Newmans contend that none of the three witnesses had the qualifications to be deemed experts.

■■■■■ Under Ind. Evidence Rule 702, "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." Ind.Evid. Rule 702(a). "The determination of whether a tendered witness is qualified to give an opinion as an expert is a matter lying within the sound discretion of the trial court." *Matter of Adoption of Lockmondy* (1976), 168 Ind.App. 563, 343 N.E.2d 793, 795. An expert may be qualified by practical experience as well as by formal training. *Head v. Comm'r, Indiana Dept. of Env. Mgmt.* (1993), Ind.App., 626 N.E.2d 518, 526. An abuse of discretion occurs if the trial court's decision is clearly against the logic and effect of the facts and circumstances before the court, or the reasonable, probable, and actual deductions to be drawn therefrom. *Myers v. Myers* (1990), Ind., 560 N.E.2d 39, 42.

■■■■ In the present case, the three witnesses qualified as experts by the court each testified to their professional qualifications and to their knowledge of the specific case. Ann Turner testified that she had been a licensed social worker for ten years, had been qualified as an expert hundreds of times in the Maryland courts, and was personally involved in the Newman case. Patricia Reidl testified that she possesses a master's degree in social work, that she is a state-certified social worker, that she had been employed by The Children's Bureau for twenty-five years, and that she was currently the Adoptions Program Supervisor. Reidl also testified regarding her numerous personal contacts with the Newmans. Franzella Starkey, L.C.'s Maryland court-appointed attorney, testified that she had been chief attorney for the Legal Aid Bureau in Salisbury, Maryland, for ten years and that she had attended numerous training programs in child welfare. Starkey testified that her personal contacts with L.C. and her siblings began in July, 1991, and that she had represented all three children in various proceedings.

Among their complaints, the Newmans argue that these witnesses have no advanced degrees, no special professional recognitions, and no special accomplishments. The Newmans also argue that the opinions of Turner and Starkey are based on hearsay because neither Turner nor Starkey had first-hand knowledge of the Newman home or L.C.'s circumstances there. As to the first argument, no such advanced degrees or special recognitions or accomplishments are necessary to qualify as an expert. As to the second, the Newmans point us to no specific hearsay testimony in the record that the trial court erred in admitting, and, in any event, under Indiana Rule of Evidence 703, an expert may give an opinion based upon hearsay or otherwise inadmissible evidence, provided that it is of the type reasonably relied upon by experts in the field.

The Newmans have failed to demonstrate that the trial court abused its discretion in qualifying these witnesses as experts.

## VII

The Newmans argue next that the trial court erred in failing to grant the Newmans' verified request for change of judge, which was filed May 19, 1994, and denied by Judge Deiter on May 20, 1994. The Newmans contend that Judge Deiter was biased and prejudiced against them, basing this contention on a series of rulings adverse to the Newmans and on the forcible removal of L.C. from the Newmans' home.

On May 12, 1994, the trial court issued an order granting full faith and credit to the March 22, 1994 order of the Circuit Court of Worcester County, Maryland, that L.C. be removed from the Newmans' home and returned to Maryland. The Newmans allege that Judge Deiter's refusal to stay this order until the adoption trial, which was scheduled for June 6, 1994, demonstrates his bias and prejudice. We disagree.

As the Newmans acknowledge, a party moving for a change of judge must establish actual personal bias against that party. *Smith v. State* (1989), Ind., 535 N.E.2d 1155, 1157. The mere fact that a court issues rulings unfavorable to a party does not establish that the court had actual personal bias against that party. *Cook v. State* (1993), Ind.App., 612 N.E.2d 1085, 1088.

The Newmans argue that there was no "rational reason" for Judge Deiter to order the removal of L.C. when the adoption hearing was just days away other than bias and prejudice. This argument is meritless. A movant for a change of judge must affirmatively show actual personal bias; an allegation that no rational reason exists for a judge's ruling is not a demonstration of bias or prejudice.

The forcible removal of L.C. from the Newmans' home took place on May 28, 1994, one week after Judge Deiter's ruling on the Newmans' request for change of judge. This event could not have formed the basis of the Newmans' request and could not have entered into the judge's decision-making process in denying the request.

The trial court did not abuse its discretion in denying the Newmans' verified request for change of judge.

Accordingly, the judgment of the trial court is affirmed.

AFFIRMED.

BARTEAU and RUCKER, JJ., concur.